UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

PETERSON INDUSTRIES, INC., Individually :
and on Behalf of All Others Similarly Situated :

                       Plaintiff, :

       vs. :

GOLDMAN SACHS GROUP, INC., GS :
POWER HOLDINGS LLC, METRO :
INTERNATIONAL TRADE SERVICES LLC, :
LONDON METAL EXCHANGE LIMITED :
and DOES 1-10, inclusive, :

                 Defendants. :

———————————————————— x

Civil Action No. 13 CV 6689

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF §§1
AND 2 OF THE SHERMAN ANTITRUST
ACT, 15 U.S.C. §§1 AND 2

DEMAND FOR JURY TRIAL

Plaintiff complains, upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, as follows:

## SUMMARY OF ALLEGATIONS

1.     In late February 2010, Goldman Sachs acquired a complex of aluminum warehouses from a company called Metro International Trade Services LLC ("Metro"), which at the time controlled more than 70% of the available aluminum in the United States. Since Goldman Sachs entered the warehouse business, the time it takes buyers to get the metal from the warehouses has ballooned to more than 16 months, up from 6 weeks. This was Goldman Sachs' design. The longer the metal sits in its warehouses, the more rent Goldman Sachs earns from aluminum purchasers. Industry insiders estimate this practice has cost American aluminum purchasers an additional $3 billion in 2012 alone, and more than $5 billion since Goldman Sachs purchased Metro in 2010.

2.     Starting in 2008, the stockpile of aluminum in the Metro warehouses has steadily grown, from 50,000 tons to 850,000 tons in 2010 to more than 1,500,000 tons currently. Over time, Goldman Sachs has earned more money on daily rent fees than the cost of the aluminum it has shipped out. This incentive has motivated Goldman Sachs to hoard as much aluminum as possible, and sit on it rather than delivering it to customers. Goldman Sachs began paying large premiums to aluminum owners to store metal at its facilities. This also has resulted in a number of other perverse practices, including Goldman Sachs' custom of shipping metal from warehouse to warehouse rather than using its delivery capacity to ship aluminum to companies who want to use it to make their products. As Europe Economics, a consultancy commissioned by the London Metal Exchange Limited ("LME") to investigate its warehousing system following a number of complaints, puts it: "The queueing problem is most acute when a warehouse develops a level of stocks that, given the existing loading out rate, means that the warehouse's income reaches a level at which after all costs, capital is fully remunerated and there is still a sufficient surplus to make it possible to buy metal at a

rate equal to or in excess of the loading out rate." At that point, the long queue becomes entrenched, and the LME contract risks become entirely detached from the physical market. There is no competitive justification for this behavior.

3.      This conduct directly adds to the price of aluminum. Because Goldman Sachs has market power in the market for physical aluminum and there are no viable alternatives in the United States, aluminum purchasers are left with no other alternative but to purchase metal stored in a Goldman Sachs warehouse. Even if customers do not purchase aluminum warehoused by Goldman Sachs, the primary U.S. aluminum pricing contract term – known as the Midwest Premium or the Midwest Transaction or Platts MW Premium ("Midwest Transaction") – is based on the cost of storage and delivery from Goldman Sachs. Since Goldman Sachs' acquisition of Metro, the Midwest Transaction has nearly doubled.

4.      The LME is complicit in this behavior. The LME oversees a marketplace for commodities trading as well as regulates the warehousing of certain metals, including aluminum. It mandates that a minimum of only 1,500 tons of aluminum be shipped daily out of all of Metro's Detroit warehouses (where the majority of the country's aluminum is stored). Despite frequent calls from industry participants to increase the minimum required load-out, the LME did not change the minimum for years, and when it eventually did, it increased it to only 3,000 tons a day per geographic region – far too little to alleviate the enormous backlogs.

5.      The LME receives 1% of the total storage fees charged by LME-approved warehouses. This includes 1% of the storage fees charged by Metro in Detroit, Michigan.

6.      Goldman Sachs denies any wrongdoing, stating that it is following the rules of the LME. But this ignores the fact it was an owner of the LME, that the LME's interests were aligned

with Goldman Sachs, and that Goldman Sachs was involved in the creation and maintenance of the rules.

7.     Goldman Sachs also alleges that the price of aluminum has decreased from 2006 to the present, conveniently neglecting that the cost of aluminum *relative to the LME trading prices* drastically increased during the Class Period (as defined below) due to the stockpiling practices.

8.     Only after years of complaints by aluminum purchasers, after the publication of a *New York Times* exposé, after hearings by the Senate Committee on Banking Financial Institutions and Consumer Protections, after the Senate Permanent Subcommittee on Investigations sought information from Goldman Sachs and other market participants on whether there should be more oversight into firms that store and trade physical commodities, and after the U.S. Commodity Futures Trading Commission, the Department of Justice and European Commission began investigations into the warehousing practices, did Goldman Sachs finally announced on July 31, 2013, that it would provide immediate delivery of aluminum to its warehouse customers.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1337, and 15 U.S.C. §§15(a) and 26.

10.    Venue is proper in this federal judicial district under 15 U.S.C. §§15 and 22 and 28 U.S.C. §1391(b) and (c) because, during the Class Period, defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of events giving rise to plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

## PARTIES

**Plaintiff**

11.     Plaintiff Peterson Industries, Inc. ("Plaintiff") is a Florida corporation with its principal place of business at 7350 NW 37th Avenue, Miami, Florida 33147. Plaintiff purchased aluminum via a contract in which the price was based on Midwest Transaction prices.

**Defendants**

12.     Defendant Goldman Sachs Group, Inc. is a leading global investment banking, securities and investment management firm that provides a wide range of financial services to a substantial and diversified client base that includes corporations, financial institutions, governments and high-net-worth individuals.  Goldman Sachs Group, Inc. is located at 200 West Street, New York, New York 10282.

13.     Defendant GS Power Holdings LLC ("GS Power Holdings") is a wholly-owned subsidiary of Goldman Sachs Group, Inc., located at 85 Broad Street, New York, New York 10004. In late February 2010, GS Power Holdings purchased Metro for $550 million.

14.     Defendant Metro International Trade Services LLC is a global warehouse operator, specializing in the storage of non-ferrous metals for the LME, located at 6850 Middlebelt Road, Romulus, Michigan 48174. As of September 16, 2013, Metro operated 73 of the active LME-listed warehouses in the United States.  Metro states on its website that: "Metal producers, Traders, and End-Users all utilize the LME system to create and maintain stability in the global non-ferrous metals market.  Metro, as a leading LME warehouse operator, brings all these market participants together."

15.     Collectively, Goldman Sachs and its wholly-owned subsidiaries GS Power Holdings and Metro are referred to as "Goldman Sachs" in this Complaint.

16.     Defendant London Metal Exchange Limited is the world center for industrial metals trading and price-risk management. More than 80% of the global non-ferrous business is transacted on LME's platforms. The LME brings together participants from the physical industry and the financial community as both a futures exchange and regulator of a worldwide network of LME-approved warehouses. The LME is located at 56 Leadenhall Street, London EC3A 2DX, United Kingdom. The LME regulates warehouses, holds meetings, sells futures contracts and facilitates the delivery of aluminum in the United States and this district. LME is currently owned by Hong Kong Exchanges & Clearing Ltd. ("HKEx"), a leading operator of exchanges and clearing houses based in Hong Kong. Prior to December 6, 2012, the shareholders with the largest ownership shares of the LME were Goldman Sachs, JPMorgan, Citigroup, Merrill Lynch and Morgan Stanley.

17.     Doe Defendants 1-10 are unnamed co-conspirators who own warehouses or have or have had ownership interest in LME.

**Co-Conspirators**

18.     JP Morgan Chase & Co. ("JP Morgan") is one of the oldest financial institutions in the United States with a history dating back over 200 years. It operates in more than 60 countries and has more than 260,000 employees worldwide. JP Morgan is located at 270 Park Avenue, New York, New York 10017. In 2010, JP Morgan acquired Henry Bath & Son Ltd., the owner of 93 metals warehouses and storage facilities. In June 2013, JP Morgan delisted 21 of its warehouses and storage facilities. In July 2013, JP Morgan announced that it was selling its commodities trading desk, including its remaining 72 metal warehouses. JP Morgan is one of 11 companies who have rights to trade in the open-outcry ring of the LME where aluminum is traded.

19.     Glencore Xstrata plc ("Glencore") is one of the world's largest global diversified natural resource companies. It has more than 90 offices located in over 50 countries, including the United States. Glencore is located at Baarermattstrasse 3, CH-6340 Baar, Switzerland. In August

2010, it was announced that Glencore purchased Italy's Pacorini Group, which operated dozens of aluminum warehouses in the United States. In September 2013, Glencore had control of 51 LME-approved metal warehouses in the United States.

20.     Trafigura Beheer BV ("Trafigura") occupies a pivotal position in the global commodities market balancing the supply and demand for raw materials that are essential to the global economy. According to Trafigura, its "production, storage, warehousing and distribution networks bring profitable opportunities. [It] both lease[s] and acquire[s] assets in support of [its] core business: trading." Trafigura is located a Gustav Mahlerplein 102, 20th Floor, Ito Tower, 1082 MA Amsterdam, The Netherlands.

21.     Trafigura wholly owns and operates a subsidiary, North European Marine Services Ltd., which wholly owns and operates a subsidiary NEMS (USA) Inc., which is a LME-approved warehousing company. Through these subsidiaries, Trafigura owns LME-licensed warehouses in the U.S. in Baltimore, Maryland; New Orleans, Louisiana; Henderson, Kentucky and has offices in Chicago, Illinois.

22.     In November 2012, Trafigura's warehouses in Antwerp, Belgium had a backlog of 9 months. In the 5 months leading up to November 2012, Trafigura's stockpile of aluminum jumped nearly five times to more than 470,000 tons. According to a trader who specializes in warehouse inventories, "Trafigura have seen the revenue income that can be generated in Detroit and Vlissingen, and it looks like they want a piece of the action as well."

## SUBSTANTIVE ALLEGATIONS

23.     Aluminum trading has occurred at the LME since 1978. Since at least as early as February 2010, more than 95% of the futures and options contracts for aluminum in the United States were traded on the LME.

24.     The LME does not facilitate physical trading for the purchase or sale of physical material.  Metal that is good for delivery is stored on warrant in LME-approved warehouses.

25.     A warrant is a document of possession, issued by the warehousing company, for each lot of LME-approved metal held within an LME-approved facility.  Warrants are used as the means of delivering metal under LME contracts.  If a warrant is not liquidated before its expiration date and is exercised, the aluminum becomes deliverable.

26.     The LME approves warehouses and storage facilities throughout the world.  There are 10 locations in the United States: Baltimore, Maryland; Chicago, Illinois; Detroit, Michigan; Long Beach, California; Los Angeles, California; Mobile, Alabama; New Orleans, Louisiana; Owensboro, Kentucky; St. Louis, Missouri; and Toledo, Ohio.

27.     LME warehousing regulations are drafted by the LME's warehouse committee, which is made up of the executives of various banks, trading companies and storage companies – including the President of Goldman Sachs' Metro, Chris Wibbelman; the CEO of Glencore's Pacorini, Peter Marc Waszkis; Founder and Managing Director of Trafigura's NEMS, Charles Bucknall; and Group General Manager of JP Morgan's Henry Bath & Son Ltd., Graham Hawkins.   *See* http://www.lme.com/en-gb/about-us/corporate-structure/committees/warehousing-committee/; http://www.lme.com/~/media/Files/Committees/Committee%20Terms%20of%20Reference/Wareho using%20Committee%20Terms%20of%20Reference.pdf.

28.     The LME only considers companies for LME approval after they submit a contract application form supported by evidence of insurance, capital adequacy and other documents.  The LME only accepts applications for the listing of new warehouses from existing approved warehouse companies.  New warehouses must be ratified by the LME Board of Directors.

29.     There are more than 700 LME-approved warehouses and storage facilities in approximately 37 locations throughout the world.

30.     One of the roles of the LME is to set the minimum rate at which aluminum is loaded-out of the warehouse and delivered to customers. In 2010, the minimum load-out rate for aluminum was 1,500 tons per day per *city*. This means that the more warehouses an aluminum supplier owned in a city, the less aluminum it would have to ship per warehouse to meet the minimum 1,500-ton load-out rate.

31.     In late February 2010, Goldman Sachs purchased Metro, which operated 19 of 23 storage facilities in Detroit. The facilities owned by Goldman Sachs have accounted for more than 70% of the nation's LME aluminum supply during the Class Period. Currently, Metro operates 29 of 37 storage facilities licensed by the LME in the Detroit area, and still warehouses approximately 80% of the nation's LME aluminum supply.

32.     Prior to Goldman Sachs' purchase of Metro, the average delivery wait time for aluminum in North American was rarely longer than one month. However, in June of 2011, the delivery wait time jumped from one month to anywhere between six to ten months. By July 2013, the wait time more than doubled, increasing to more than 16 months.

33.     By 2011, approximately one quarter of the aluminum held in LME's warehousing system was stored in Detroit. Of the 4.62 million tons in the LME system, Detroit housed 1.15 million tons. Warehouses owned by Metro store over 900,000 tons of aluminum in Detroit. At these numbers, it was estimated to take 600 days, or 120 working weeks, to deliver out 900,000 tons of aluminum from a warehouse at a rate of 1,500 metric tons a day, the minimum amount required according to LME rules.

34.     Stockpiles of aluminum stored in LME warehouses have risen more than five-fold since the start of 2008. For example, between January and June of 2011, Metro's Detroit warehouses took in 364,175 tons of aluminum but delivered only 171,350 tons. The amount Metro took in represented 42% of the inventory arrivals globally but only 26% of the metal delivered out. By the end of 2011, Detroit LME-approved warehouses held 1,264,775 tons of aluminum, the largest concentration in the system.

35.     The longer stored aluminum sits in Goldman Sachs' warehouses, the more money it earns from rent.

36.     Intended as a market of "last resort," meaning the industry can use the warehouse to sell excess stock in time of oversupply and a source of material in times of extreme shortage, LME warehouses have become a market of "first resort" or the "go-to market" in which the industry, producers, consumers, traders, merchants and banks, use the storage system as an alternative physical market. Using LME warehouses as a system of first resort has caused the system to back up "like a funnel" where market participants "dump large amounts of metal in the front end and only get a little out the back end." According to David Wilson, director of metal research at Société Générale SA, "it enables a situation where the rules of the warehousing system are taken advantage of."

37.     With the surplus income Metro earns from rents, it is able to offer cash incentives to aluminum producers. Aluminum producers are offered incentives by Metro to store their metal in Metro's sheds for contracted periods, sometimes for as much as $250 per ton. Other reports indicate that incentives have exceeded $300 per ton. The incentive system brings in far more aluminum than it allows to leave the warehouse, causing long delays in the delivery of metal and, in turn, inflating prices for aluminum.

- 9 -

38.     Despite the extended wait period for aluminum delivery during the Class Period, Metro deliberately removed only the minimum amount of aluminum from its Detroit warehouses. Metro rarely ships out more than the minimum required, thereby contributing to the supply bottleneck and higher premiums for physical delivery.  In 2011, it took "two weeks to put aluminum in, and six months to get it out," according to Dave Smith, the strategic procurement manager at Coca-Cola.

39.     During the Class Period, there was no minimum load-out rate for end-users of aluminum – all customers in the queue were treated on a first-in-first-out basis.  Those entities that owned aluminum, including entities who owned it specifically for speculation or hedging purposes and never intended to take delivery of the aluminum and intended to allow their warrants to expire, were all treated the same under LME rules.  Therefore, consumers that use the aluminum for production purposes were forced to wait and or pay inflated prices.

40.     Though Goldman Sachs was able to deliver aluminum to end-users of the metal, it instead used its transport capacity to move much of the aluminum that became deliverable on behalf of speculators from warehouse to warehouse in order to satisfy the 1,500-ton per day load-out requirement.  Former Metro forklift driver, Tyler Clay, called the process of shuffling around metal from warehouse to warehouse the "merry-go-round of metal."  In the past, Metro attributed delays in delivery of metal to logistical problems, including shortages of trucks and forklift drivers, and administrative issues with tracking down metal in the warehouse.  However, interviews with current and former Metro employees suggest that longer wait times are part of the company's internal business plan and strategy to help Goldman Sachs increase profits from its warehouses.  In 2011, a senior analyst in the metals industry told *Reuters*: "If you take Detroit in particular, those warehouses historically extracted metal at a faster rate . . . the infrastructure is there."

- 10 -

41.     As much as 80% of LME aluminum is locked into "financing deals" and is unavailable to the market. Financing deals are where traders or banks buy metal from producers and then sell it for future delivery to speculators at a profit, a market spread known as "contango." Contango is where future prices are higher than spot prices for immediate delivery. As traders and bankers lock up 80% of the aluminum supply and warehouses hoard what remains, physical buyers are forced to wait in long queues or are forced to purchase aluminum from the spot market at an inflated rate. It is this contango which allows Goldman Sachs to continue to profitably warehouse aluminum.

42.     The LME is the de facto price formation venue for industrial metals. The prices "discovered" on their platforms are used as the global benchmark and basis for the physical trading of aluminum. The benchmark on which aluminum is purchased in the United States – the Midwest Transaction – is predominately made up of the LME price, plus warehousing costs.

43.     The Midwest Transaction premium over LME prices nearly tripled from 2009 to early 2013, from approximately 4 cents a pound in early 2009 to 6 cents in early 2010 to 12 cents in early 2013. This increase is economically detached from the demand for aluminum, especially considering the large aluminum stockpiles Goldman Sachs had during the Class Period. What defendants created is a delay-related shortage, not a supply-related shortage.

44.     The alternative to purchasing metal from an LME warehouse is to find another source, such as buying from a producer or merchant. However, finding alternative supplies of aluminum also comes at a premium, as the price tracks the Midwest Transaction price. *See* David Kocieniewski, U.S. Subpoenas Goldman in Inquiry of Aluminum Warehouses, *The New York Times* (Aug. 12, 2013).

45.     In 2011, Metro charged its customers 42 cents a day to store one metric ton of aluminum in Detroit.  With 900,000 tons of aluminum in the warehouse, Goldman Sachs earned $378,000 a day on storage costs, or approximately $79 million in seven months.  In April 2012, the per-ton cost of storage was raised to 45 cents.  By July 2013, the per-ton cost of storage for aluminum in Metro's warehouses had increased to 48 cents.

46.     The LME earns 1.0% of the total storage fees charged by its approved warehouses.

47.     In July 2012 the LME's shareholders voted to sell the exchange to HKEx for £1.4 billion.  Before the sale of the LME, Goldman Sachs owned approximately 9.5% of the LME and JP Morgan owned approximately 11%.

48.     The minimum load-out requirement was supported by Goldman Sachs, JP Morgan, Glencore and Trafigura in their roles as owners of the LME and/or members of the LME Warehousing Committee.  It was in their best interest to maintain the low load-out requirements both as warehouse owners and as owners of the LME.

49.     The purchase of metal storage warehouses by banks and trading houses has caused many to speculate on a conflict of interest, as they could use the knowledge gathered from the operations end to gain an unfair advantage on the financial market.  Policy makers and consumer advocates have questioned whether Metro's slow deliveries are connected to financial-market bets tied to the value of certain metals.  "Information is worth money in the trading world and in commodities, the only way you get it is by being in the physical market," said Jason Schenker, president and chief economist at Prestige Economics in Austin, Texas.  "So financial institutions that engage in commodities trading have a huge advantage because of their ownership of physical assets gives them insight in physical flows of commodities."

50.     It was not until HKEx purchased the LME that the LME intervened to moderate the aluminum bottleneck.  Under new ownership and leadership, specifically that of CEO Charles Li, who threatened to take a "bazooka" to the warehousing problem, the LME proposed forcing warehouses with queues of at least 100 days to deliver metal out at a rate of at least 1,500 tons more per day than is brought into the warehouse.  The proposal marks a clear shift in tone at the LME. Prior to Mr. Li's leadership, former LME CEO Martin Abbott argued that queues were part of the economic environment and that it was not the LME's place to forcibly remove them.[1]

51.     On July 1, 2013, Mr. Li announced that the LME could have been more proactive with regard to the warehousing issue. "Some market participants have suggested that if the LME had applied stronger measures a few years ago, the size of the problem could have been reduced," he wrote in a blog post. "We acknowledge that possibility with the benefit in hindsight." Mr. Li further stated: "If people have to wait a year, that's a very big problem; it is a level-one issue. If somehow the LME system is making clients suffer in that way, that is not acceptable."

52.     Throughout the Class Period, the warehousers and LME were on notice of customer complaints about the rising costs of aluminum and the delays caused by the warehousing scheme. These include publicly reported complaints by Coca-Cola, General Motors, Novelis (the world's top producer of aluminum cans), PepsiCo, Anheuser-Busch, MillerCoors and others.

53.     The warehousing problem also exists in markets outside of North America.  By 2012, warehouses in Vlissingen, the Netherlands, held more than 900,000 tons of aluminum, when in the previous year they had only 300,000 tons of aluminum in storage.  Glencore, the world's largest metal trader, owned 27 of the 29 LME-registered warehouses in Vlissingen.  Even with the new minimum out take quotas, there is a wait time of 212 working days.  As a result of the extended wait

---

[1]     Martin Abbott was the LME CEO from 2006 until his resignation in 2013.

times for aluminum, Glencore's warehousing unit made $31 million in profit in 2010.  It is also estimated that JP Morgan, through Pacorini, makes $150 million a year in rental charges just from aluminum backlog in its Vlissingen warehouses.

54.    Industry experts estimate that the cost of physical aluminum was inflated by more than $3 billion per year from 2010-2012 alone.  Since Goldman Sachs' 2010 acquisition of Metro, other experts estimate that purchasers of physical aluminum paid more than $5 billion in overcharges because of the scheme alleged in this Complaint.

55.    On July 31, 2013, Goldman Sachs agreed to deliver the aluminum warranted by purchasers of the commodity, acknowledging "[i]n recent weeks, there has been additional focus on metals warehouses as certain end users have complained about the long wait times to get aluminum out of LME storage."  Goldman Sachs' Chief Operating Officer, Gary Cohn, stated on CNBC: "We feel horrible for consumers if they can't get metal."

56.    Goldman Sachs announced that in order to "address any concerns that the warehouses are limiting the supply of aluminum," it will:

- "support the intent of the recently proposed rule change by the LME that will cut existing queues and prevent new queues from forming by increasing substantially the amount of daily net outflows of metal at large LME locations";

- "suggest that the LME establish a system to prioritize consumers so that they always have access to a minimum load out rate for end users"; and

- "support enhanced disclosure at the LME, including with respect to who owns the warrants for metals and to designate by broad market participant category who is in the queue."

This demonstrates that action could have been taken earlier to alleviate the delays in the delivery of aluminum to the customer.

- 14 -

**Governmental Scrutiny**

57.     In early August 2013, the U.S. Commodity Futures Trading Commission ("CFTC") sent a subpoena to Goldman Sachs seeking all of its documents and communications related to the LME since January 2010. The CFTC also ordered Goldman Sachs to preserve emails, documents and instant messages from the past three years. Goldman Sachs had until August 23, 2013 to send every document, communication, voice recording, correspondence and internal and external emails related to the LME since January 2010. The subpoena included more than 30 areas of interest to the CFTC and particularly focused on anything that relates to moving metal from one warehouse to another within the same company and procedures for loading out, in particular incentives or premiums given to metal producers in exchange for storing metal, daily loading rates, high load-out requests, delivery policies and procedures and complaints about load-out requests. The CFTC also requested details of any trading based on prices derived from the LME and Platts.

58.     In an email to *Reuters* on July 20, 2013, Bart Chilton, one of the five members on the CFTC, urged a "full and comprehensive review" of warehouse ownership. "These markets are too important to allow behind-the-scenes machinations to distort commodity prices."

59.     In response to the investigation, Senator Sherrod Brown of Ohio stated that "[t]he CFTC has a role to play in protecting American manufacturers and consumers from having the price of their gas, canned food and beverages, or electricity driven up by Wall Street speculators. . . . The CFTC should use the full force of its power to address this abuse." Senator Ed Markey of Massachusetts stated that "large investment banks should not be allowed to warehouse physical commodities like fuel or building materials, inflating prices for consumers and small businesses and profits for Wall Street."

60.    In July 2013, the chairman of the U.S. Senate Committee on Agriculture, Nutrition and Forestry called on the CFTC to clarify what powers it has to regulate the LME warehousing system.

61.    In July 2013, the DOJ's antitrust division launched a probe into the practices alleged in this Complaint, which included a visit to a warehousing firm in the United States and an inquiry into how the business was run.   The DOJ also sent letters to at least two companies that own warehouses seeking more information about warehousing practices.

62.    In July 2013, the Financial Conduct Authority ("FCA"), Britain's financial watchdog, launched a preliminary inquiry into the LME regarding its warehousing practices.   The FCA is in close contact with the LME and the CFTC regarding their investigations.   The FCA stated that it was working closely with the LME to fix the exchange's warehousing system.

63.    In July 2013, the Senate Committee on Banking Financial Institutions and Consumer Protections held a hearing about whether "Too Big to Fail" banks should be allowed to operate freely in loosely regulated physical commodity markets and own physical commodity assets.   The hearing involved testimony from MillerCoors indicting the LME's warehousing practices.

64.    Because of the concerns of improper information sharing, the Federal Reserve is currently considering a proposal to overturn a 2003 ruling that first allowed commercial banks to trade and own physical assets.

65.    In late 2012, the European Commission discussed aluminum premiums and difficulties in getting metal from warehouses monitored by the LME.   "We can confirm that industry, especially aluminum industry, has brought to our attention the difficulties with accessing material from LME warehouses and abnormal high premiums," Carlo Corazza, a spokesman for the European Commission's Enterprise and Industry Directorate General said.

- 16 -

66.     Following government scrutiny and focus on reducing the delivery time for aluminum, the surcharge added to the price of aluminum for immediate delivery on the LME slid 23% from its high in June according to a report by Harbor Intelligence of Austin, Texas. They also estimated that premiums may fall 25% more by the end of 2013.

## RELEVANT MARKET AND MARKET POWER

67.     The relevant market is the market for the purchase of LME-warranted aluminum in the United States.

68.     During the Class Period, Goldman Sachs owned more than 80% of the U.S. warehouses approved by the LME for the storage of aluminum.

69.     During the Class Period, the LME had more than 97% of the aluminum futures trading market in the United States and had the power to approve and regulate the warehouses that hold more than 95% of the aluminum available for such trading.

70.     Because there is a high premium in acquiring aluminum on the physical market, the physical market does not compete with the LME-controlled market.

71.     Alternatively, the relevant market is the market for the purchase of aluminum in the United States.

72.     During the Class Period, Goldman Sachs owned the warehouses that contained more than 70% of the aluminum in the United States.

73.     During the Class Period, the LME had the power to approve and regulate the warehouses that hold more than 70% of the aluminum in the United States.

## EFFECTS ON INTERSTATE COMMERCE

74.     Defendants' unlawful acts alleged in this Complaint had a substantial effect on interstate commerce and caused antitrust injury to Plaintiff and the Class.

- 17 -

75.     Defendants' unlawful acts had the purpose and effect of inflating the cost and reducing the availability of aluminum in the United States.

76.     As a direct result of defendants' violations, Plaintiff and the members of the Class have been damaged in their property or business, and have paid supra-competitive prices.

## ANTITRUST INJURY

77.     As a direct and foreseeable result of defendants' unlawful anticompetitive acts, the cost of aluminum storage was inflated, the price of aluminum purchased through contracts with price terms based on the Midwest Transaction was inflated and the output of aluminum was reduced, depriving Plaintiff and the Class of normal, competitively set market prices for aluminum.

78.     As a direct result of defendants' violations, Plaintiff and the members of the Class have been damaged in their property or business, and have paid supra-competitive prices.

## CLASS ALLEGATIONS

79.     Plaintiff brings this action individually and on behalf of all others similarly situated, pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following "Class":

> All persons who, from February 22, 2010 until the anticompetitive effects of defendants' conduct cease (the "Class Period"), purchased aluminum pursuant to a contract with a price term based on the Midwest Transaction (or similar terminology). Excluded from the Class are defendants, any parent, subsidiary, affiliate, agent or employee of any defendant, any co-conspirator and any governmental entity.

80.     The Class is made up of hundreds, if not thousands, of purchasers of aluminum geographically dispersed across the United States, and thus is so numerous that joinder of all members is impracticable.

81.     Common questions of law and fact exist to all members of the Class and predominate over questions affecting only individual Class members.  These common questions include:

(a)     Whether defendants conspired or engaged in concerted action in restraint of trade;

(b)     Whether defendants monopolized, attempted to monopolize or conspired to monopolize the market for LME-warranted aluminum;

(c)     Whether defendants conspired to restrain the supply or reduce the output of LME-warranted aluminum;

(d)     Whether defendants' conspiracy affected the price of LME-warranted aluminum, including the Midwest Transaction;

(e)     Whether defendants' conspiracy caused antitrust injury to the property of Plaintiff and the Class; and

(f)     Whether damages, restitution or injunctive relief is appropriate, and if so, what the appropriate relief is.

82.     Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like other Class members, purchased aluminum with a price term based on the Midwest Transaction.

83.     Plaintiff is an adequate representative of the Class because its interests do not conflict with the interests of any of the members of the Class it seeks to represent.  Plaintiff has retained counsel competent and experienced in complex class action litigation, including antitrust class action litigation.

84.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and would create the danger of inconsistent or contradictory judgments and increase the delay and expense to all parties.  The benefits of adjudicating this controversy as a class action would create

substantial economies of time, effort and expense and outweigh any difficulties that may occur in managing the Class.  Plaintiff anticipates no difficulty in the management of this action as a class action.

**COUNT I**

**Against Defendants for Violations of Section 1 of the Sherman Act**

85.     Plaintiff incorporates by reference the preceding allegations.

86.     Beginning on or about February 22, 2010, defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of the Sherman Act, 15 U.S.C. §1, which directly and foreseeably inflated prices for aluminum in the United States, including the Midwest Transaction.

87.     Defendants' conduct constitutes a *per se* violation of the federal antitrust laws and is an unreasonable and unlawful restraint of trade.

88.     Defendants agreed to and did abuse their market power over essential areas of commerce involving warehousing and futures trading.

89.     Defendants entered into the agreements alleged in this Complaint which had the effect of inflating aluminum prices, including the Midwest Transaction prices of aluminum, and which thereby inflated defendants' profits and revenues.

90.     Defendants' agreements constituted unreasonable restraints of trade for many reasons, including the following:

(a)     In order to restrain aluminum supplies in the United States, Goldman Sachs released the minimum amount of physical aluminum for delivery as allowed under LME rules.  As aluminum stockpiles increased in Goldman Sachs' warehouses, the amount of profit it gained from warehousing rents increased, until the amount of profit it gained from warehousing aluminum exceeded the cost of purchasing more aluminum than it loaded out.  This put Goldman Sachs in an

upward spiral of profitability, as long as it continued to purchase aluminum at a greater rate than it loaded out. In order to maintain its stockpiles, Goldman Sachs overbid on the price of aluminum, driving up the price of aluminum and the Midwest Transaction.

(b)     Defendants agreed amongst themselves to ensure the load-out minimum was maintained at a level that was artificially below demand in order to protect their ability to stockpile aluminum and generate rents. This had the effect of preventing the prompt delivery of desired aluminum, and drove up the price of aluminum and the Midwest Transaction.

(c)     Despite being capable of delivering aluminum to customers, defendants agreed to load-out less aluminum than they were physically able. This resulted in employees and equipment being idle and also resulted in aluminum being moved from warehouse to warehouse rather than being delivered to the customer.

(d)     Defendants agreed to storage rates that were much higher than competitive storage rates and further agreed to increases in storage rates to even higher supra-competitive levels in order to compensate for any increase in the minimum load-out rate.

(e)     Aside from reaping supra-competitive profits, there was no justification, economic or otherwise, for this conduct.

91.     This conduct and its resulting impact on the market, occurred in and affected interstate commerce.

92.     As a direct and foreseeable result, Plaintiff and Class members were injured in their property, including that they had to pay artificially high Midwest Transaction prices for aluminum. Absent injunctive relief, these violations may continue or reoccur in the future.

## COUNT II

### Against Defendants for Violations of Section 2 of the Sherman Act

93.     Plaintiff incorporates by reference the preceding allegations.

94.     Beginning on or about February 22, 2010, defendants and their co-conspirators used their monopoly power in violation of the Sherman Act, 15 U.S.C. §2, which directly and foreseeably inflated prices for aluminum in the United States, including the Midwest Transaction.

95.     Goldman Sachs abused its monopoly power in the warehousing market to engage in anticompetitive behavior.

96.     The LME abused its monopoly power in setting the minimum rates for loading-out of aluminum and its regulatory authority over warehousing to engage in anticompetitive behavior.

97.     This conduct and its resulting impact on the market, occurred in and affected interstate commerce.

98.     As a direct and foreseeable result, Plaintiff and Class members were injured in their business or property, including that they had to pay artificially high Midwest Transaction prices for aluminum. Absent injunctive relief, these violations may continue or reoccur in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

A.     Certifies this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and enters an order appointing Plaintiff as the class representative and Plaintiff's counsel as Class Counsel;

B.     Enters an order enjoining defendants' challenged conduct, and declaring and adjudging that such conduct is unlawful;

C.     Enters a judgment awarding Plaintiff and the Class damages against defendants as a result of defendants' unlawful conduct alleged in this Complaint, plus treble damages and all other available damages, including any statutory or liquidated damages or otherwise;

D.     Awards to Plaintiff and the Class their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

E.      Awards any other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by

jury on all issues that can be tried to a jury.

DATED:  September 20, 2013                    ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                             SAMUEL H. RUDMAN
                                             ROBERT M. ROTHMAN


                                             _____
                                                   SAMUEL H. RUDMAN

                                             58 South Service Road, Suite 200
                                             Melville, NY  11747
                                             Telephone:  631/367-7100
                                             631/367-1173 (fax)

                                             ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                             BONNY E. SWEENEY
                                             DAVID W. MITCHELL
                                             CARMEN A. MEDICI
                                             655 West Broadway, Suite 1900
                                             San Diego, CA  92101
                                             Telephone:  619/231-1058
                                             619/231-7423 (fax)

                                             ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                             PAUL J. GELLER
                                             MARK DEARMAN
                                             120 East Palmetto Park Road, Suite 500
                                             Boca Raton, FL  33432
                                             Telephone:  561/750-3000
                                             561/750-3364 (fax)

RICHARD H. BREIT, P.A.
RICHARD H. BREIT
8551 W. Sunrise Blvd., Suite 300
Plantation, FL  33322-4007
Telephone: 954/452-1144
954/452-3311 (fax)

Attorneys for Plaintiff